RENDERED: JULY 10, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-1609-ME


J.D.; A.D.; AND E.D.                                            APPELLANTS


                     APPEAL FROM HENDERSON FAMILY COURT
v.                      HONORABLE DAVID CURLIN, JUDGE
                           ACTION NO. 25-J-00094-001


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; B.T.; C.D.;
E.W.D., A MINOR CHILD; AND J.T.                        APPELLEES

AND


NO. 2025-CA-1614-ME


J.D.; A.D.; AND E.D.                                              APPELLANTS


                     APPEAL FROM HENDERSON FAMILY COURT
v.                      HONORABLE DAVID CURLIN, JUDGE
                           ACTION NO. 25-J-00094-002


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND

FAMILY SERVICES; B.T.; C.D.;                                           APPELLEES
E.W.D., A MINOR CHILD; AND J.T.

AND

NO. 2025-CA-1616-ME

J.D.; A.D.; AND E.D.                                                   APPELLANTS

APPEAL FROM HENDERSON FAMILY COURT
v.              HONORABLE DAVID CURLIN, JUDGE
ACTION NO. 25-J-00094-003

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; B.T.; C.D.;
E.W.D., A MINOR CHILD; AND J.T.                                        APPELLEES

AND

NO. 2025-CA-1617-ME

J.D.; A.D.; AND E.D.                                                   APPELLANTS

APPEAL FROM HENDERSON FAMILY COURT
v.              HONORABLE DAVID CURLIN, JUDGE
ACTION NO. 25-J-00094-004

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND

FAMILY SERVICES; B.T.; C.D.;                                                    APPELLEES
E.W.D., A MINOR CHILD; AND J.T.

AND

NO. 2025-CA-1618-ME

J.D.; A.D.; AND E.D.                                                            APPELLANTS

APPEAL FROM HENDERSON FAMILY COURT
v.          HONORABLE DAVID CURLIN, JUDGE
ACTION NO. 25-J-00094-005

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; B.T.; C.D.;
E.W.D., A MINOR CHILD; AND J.T.                                                 APPELLEES

AND

NO. 2025-CA-1619-ME

J.D.; A.D.; AND E.D.                                                            APPELLANTS

APPEAL FROM HENDERSON FAMILY COURT
v.          HONORABLE DAVID CURLIN, JUDGE
ACTION NO. 25-J-00094-006

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND

FAMILY SERVICES; B.T.; C.D.;                                    APPELLEES
E.W.D., A MINOR CHILD; AND J.T.


OPINION
REVERSING

** ** ** ** **

BEFORE:  CETRULO, ECKERLE, AND MOYNAHAN, JUDGES.

CETRULO, JUDGE:  This appeal arises from an adjudication of abuse in the Henderson Family Court against six adults, all of whom allegedly had access or an opportunity to have caused injuries to a non-mobile infant.  The parties do not dispute that this infant sustained rib fractures, and all agree that the family court properly concluded that the child sustained physical abuse.  However, the court did not make a finding that any particular person caused those injuries, yet it adjudicated all six individuals as having "failed to protect the child or provide an adequate explanation for the injuries."  For reasons set forth below, we must reverse the ruling as to A.D., J.D., and E.D. (collectively "Appellants").

**PROCEDURAL BACKGROUND**

E.W.D. ("Child") was born in September 2024.  Her mother, J.W. ("Mother"), and biological father, C.D. ("Father"), were never married; however, Father promptly filed a paternity action when Mother refused to include him on the birth certificate.  He then sought visitation and custody through the courts.  In

those proceedings, the family court established an alternating 2-2-3 timesharing schedule between the two households, which meant that Child alternated between the homes of Mother and Father every two to three days. This timesharing schedule began in January 2025. At that time, Father resided with the Appellants: his father, J.D. ("Paternal Grandfather"); his mother, E.D. ("Paternal Grandmother"); and his 18-year-old sister, A.D. ("Paternal Aunt"). Father's household also included two other members under the age of 18. Mother's household consisted of herself and then-boyfriend, B.T. ("Stepfather").

On March 17, 2025, when Child was approximately five months old, Mother took her to Union County Hospital because of a bruise on Child's right shoulder. The bruise was eventually determined to be a birthmark, but due to other suspicions of abuse, Child was transferred to Norton Children's Hospital ("Norton's") for further assessment. Once at Norton's, imaging revealed an "incidental finding" of a healing fracture of Child's posterior seventh rib. Norton's promptly reported suspected physical abuse to the Cabinet for Health and Family Services (the "Cabinet"), and on March 18, 2025, Cabinet social service clinician Ashley Miller ("SSC Miller") began her investigation.

Norton's discharged Child on March 20, 2025, with a safety plan requiring third-party supervision. However, this safety plan lasted only 24 hours before the Cabinet permitted Mother and Father to resume the 2-2-3 schedule

without supervision. Child continued alternating between homes until April 9, 2025, when Father took Child to her follow-up appointment for a skeletal survey at Norton's.

On April 9, Dr. Melissa Currie, a physician with Norton's pediatric protection team, discovered two new injuries: bruising on Child's jawline and a fracture to Child's posterior ninth rib. With the discovery of these injuries, Norton's filed another report of suspected child abuse with the Cabinet. The next day, SSC Miller consulted with Dr. Currie, who advised that Child's injuries were indicative of non-accidental trauma. SSC Miller then filed dependency, neglect, and abuse ("DNA") petitions and a supporting affidavit for emergency custody with the Henderson County Family Court on April 11, 2025. The DNA petitions alleged that Child was abused within the meaning of KRS[1] 600.020(1) and named six individuals believed responsible for the abuse. These individuals included Mother, Stepfather, Father, and Appellants.

On April 11, the family court granted emergency custody of Child to the Cabinet, and Child was removed from her homes. Mother and Father were permitted supervised visitation and assigned case plans.

---

[1] Kentucky Revised Statute.

The adjudication hearing in this matter occurred on October 24, 2025. The Commonwealth called SSC Miller as its first witness. SSC Miller testified that she was employed as the Cabinet's Chief Specialized Investigator for the Two Rivers Region when she began investigating the physical abuse allegations concerning Child. She summarized her interviews with Mother and Father, noting that each parent disclosed concerns to her about the other, and that neither reported those concerns prior to the investigation. For instance, on or about March 10, 2025, Father noticed a subconjunctival hemorrhage after receiving Child from Mother's custody. He documented Child's injury with a video recording, which he provided to SSC Miller during the investigation. SSC Miller shared that video with Dr. Currie.

SSC Miller described the events and findings that led to filing the petitions, yet acknowledged she could not establish a specific timeline for Child's injuries, determine Child's location when the injuries occurred, nor identify the perpetrator(s) from her investigation. Given the inability to pinpoint the responsible person or household, SSC Miller testified that she named the six adults in the DNA petitions as "all of these parties resided in the home when the child was there for each respective parent's parenting time, so therefore, they had equal access and equal opportunity to be around the child." Despite Father's other sibling and his fiancée residing in the house, SSC Miller did not include them as

-7-

respondents because she believed they were both under the age of 18 at the time. She further explained that she considered the six adults to have all served as Child's caretakers. When asked to define "caretaking role" for DCBS[2] purposes, SSC Miller described it in "broad" terms to include basically "anyone that provides care for a child" and clarified that it was not limited to biological parents.

SSC Miller testified that, according to her investigatory interview with Father, the paternal grandparents had babysat Child during his parenting time; SSC Miller, however, could not provide a timeframe when they last watched Child. Asked whether it was her understanding that Father's parents babysat Child as recently as her investigation, SSC Miller answered, "It could have."

SSC Miller agreed that the evidence regarding Paternal Aunt's caregiving was "minimal" and consisted of babysitting Child on one occasion in January 2025, which lasted no more than 30 minutes before she called Paternal Grandmother for help. Similarly, Paternal Grandfather did not spend a lot of time with Child as he traveled for work, but SSC Miller nevertheless named him in the petition because he was in the household.

During cross examination, counsel questioned SSC Miller whether she knew that Father's other sibling turned 18 in January 2025. In response, SSC Miller admitted that she had no prior knowledge of that information. Counsel next

---

[2] Department for Community Based Services.

directed SSC Miller to evidence from her investigation that Mother's mother and Stepfather's mother also babysat Child on occasion. SSC Miller agreed to her knowledge of the other grandmothers' caregiving roles and testified that they were not included in the petitions because they did not reside in Mother's household. However, she conceded once more that she lacked evidence of exactly where Child's injuries occurred. Finally, SSC Miller acknowledged that the only injury that she was able to "substantiate" was the bruising on Child's jawline, and that finding was made against Mother and Stepfather.

The Commonwealth called Dr. Currie as its next witness.[3] Dr. Currie treated Child on two occasions, the first instance occurring on March 18, 2025. Dr. Currie testified that on that date, Child was "developmentally on target" for a five-month-old: Child was not taking steps, nor pulling or sitting up, but could roll over. Dr. Currie explained when Child's initial skeletal survey was performed at Norton's, the pediatric radiologist did not identify a fracture of Child's posterior seventh rib. It was not until Dr. Currie's review of the images that the fracture was detected. Dr. Currie then consulted with the radiology team, which agreed with her findings and added an addendum to the report.

---

[3] The parties stipulated that Dr. Currie was qualified to present expert testimony regarding child abuse.

Regarding the April 9 follow-up appointment, Dr. Currie testified to discovering a fracture of Child's posterior ninth rib; this subsequent fracture appeared "newer" than the one detected on March 18, which indicated that the two fractures occurred on separate occasions. Based on the signs and stages of healing, Dr. Currie estimated that the injuries were inflicted at some point from February 2025 to early March 2025, and opined that the posterior seventh rib fracture, but not the posterior ninth rib fracture, could have occurred as early as late January 2025. Dr. Currie also provided testimony that a significant amount of "violent" force was required to fracture an infant's ribs. To that end, Dr. Currie explained that when performing chest compressions on infants, rib fractures are very rare and occur in a different place.

Dr. Currie further testified about Child's eye hemorrhage and her review of Father's video evidence. She recounted Father's explanation that he noticed Child's eye after picking her up from Mother and that when he questioned Mother about it via text, Mother responded that Child had been coughing a lot. Dr. Currie stated that recent research indicates it is rare for this to occur from coughing, sneezing, or crying.

Dr. Currie likewise found the bruising to Child's jawline concerning, as Child was too young developmentally to self-inflict a bruise of that severity.

Dr. Currie opined that "direct, blunt force trauma to the area," such as grabbing of the face, would be required.

Finally, Dr. Currie found no plausible explanation for Child's injuries other than non-accidental trauma[4] but was unable to identify a perpetrator. Near the end of Dr. Currie's testimony, the family court questioned whether her review of Child's medical records revealed any signs of distress or indicated a reason – other than the misidentified birthmark – that Child needed medical attention on March 17, 2025. Dr. Currie simply answered, "no, your Honor." The Commonwealth followed up with a line of questioning on whether Child would have experienced prolonged discomfort from the rib fractures. In response, Dr. Currie stated she would expect Child to have experienced some tenderness around the area of the fractures and then offered the following caveat:

> However, it is very uncommon for caregivers to pick up on that tenderness. They sometimes will just describe the baby as being a little more fussy or maybe notice that she seems to be happier when they put her down rather than when they pick her up. Often that's something that they recognize in retrospect, but not always. So, it is not uncommon for nonoffending caregivers to be completely unaware that a child's ribs are broken and to attribute whatever fussiness they detect to teething or something else.

---

[4] A second opinion from a provider at Vanderbilt also confirmed that the injuries were the result of abuse.

Following Dr. Currie's testimony, the Commonwealth rested its case. The family court then heard testimony from some of the respondents themselves, specifically Father, Paternal Aunt, and Paternal Grandmother. Paternal Aunt testified first. She expressed her love for Child and immediately became tearful at the thought that Child was hurt by somebody. In general, she explained her uneasiness around young children because she worried about not knowing what they may need; therefore, she preferred to have parents or more experienced adults present. Paternal Aunt testified that she babysat Child by herself on only one occasion in January 2025 when Paternal Grandmother went to the YMCA near their house. Paternal Aunt recounted that Child began crying within the first 10 to 20 minutes, which she suspected was due to hunger, and immediately called Paternal Grandmother to come back home. Paternal Aunt estimated that she was alone with Child for no more than 30 minutes and denied harming Child.

Paternal Grandmother later testified and confirmed Paternal Aunt's account of her brief babysitting attempt, except to clarify that 30 minutes was generous and that she felt the timing was much shorter. She testified that Paternal Aunt and Paternal Grandfather were "very rarely" in a caretaking role. She affirmed that Paternal Grandfather frequently traveled for work. She also described seeing Mother violently attacking Father once when they were still

involved. She denied any knowledge of any injuries occurring while Child was in their home.

Father testified and stated that he had no knowledge of injuries nor indication that Child had broken ribs until the case was opened. He acknowledged that he took a video of Child's eye hemorrhage in March, but he did not report it at the time as there was no caseworker nor report of abuse until after that. Additionally, he had contacted Mother, and she had offered an explanation. A friend of both parents testified to her belief that Mother was "trying to set Father up" because Mother had sent a photograph of the birthmark to her and said she was going to the emergency room to report this. The friend, having spent time with Mother and Child, knew that the mark on Child's shoulder was a birthmark. Neither Mother nor Stepfather testified at this proceeding.

At the close of the evidence, counsel for the Cabinet acknowledged that it was impossible to identify the perpetrator of these injuries. However, both the Cabinet and the Guardian *ad litem* ("GAL") argued against dismissing any of the respondents to ensure that "we're hitting it from every angle that we possibly can to protect her." The family court found Dr. Currie's testimony credible, determining that abuse did occur on at least two separate occasions. While recognizing that the result might seem hard, especially to those who had very limited roles, the court said, "I don't know who did it. I'm not going to lay the

blame at any person's foot" as all parties had equal access and opportunity to injure Child. The court specifically found that each of the six had a caretaking role and qualified as a person exercising custodial control or supervision ("PECCS") under KRS 600.020(47).

The Appellants filed a timely CR[5] 59.05 motion from this adjudication order noting the absence of any individualized findings. A discussion occurred on the record at a subsequent hearing in which the Appellants asked the court about the impact of this adjudication upon them. Neither the court nor the social worker present that day seemed to have any knowledge as to whether the adjudication would prevent the Appellants from serving as foster parents, coaches, or working with children or seniors in the future. Neither party addresses this on appeal.[6]

Regardless, the court did agree that since it had adjudicated abuse, it likely needed to issue more specific findings. This was done by an amended order,

---

[5] Kentucky Rule of Civil Procedure.

[6] In the case of an individual found by the Cabinet to have abused or neglected a child, and whose substantiated incident was upheld upon appeal, 922 Kentucky Administrative Regulation 1:470 requires that the name of each individual found by the Cabinet to have abused or neglected a child, and whose substantiated incident is upheld upon appeal, to be placed upon a Central Registry for at least seven (7) years. *Richie v. Cabinet for Health & Fam. Servs.*, No. 2023-CA-0900-MR, 2024 WL 2983523, at *1 (Ky. App. Jun. 14, 2024). Here, we have conflicting statements on the record as to whether the Appellants received such a letter from the Cabinet, which then entitles them to an appeal/administrative hearing, since it did not "substantiate" as to them.

adding individualized findings that each of these six individuals had participated in

Child's care or been part of the caregiving environment and "had failed to protect

or recognize or provide any credible explanation for the injuries." This appeal

followed.[7, 8]

Mother, Father, and Mother's boyfriend did not join this appeal.

**ANALYSIS**

Dependency, neglect, and abuse proceedings are governed by KRS

Chapter 620. KRS 620.010 mandates that:

> [T]his chapter shall be interpreted to effectuate the
> following express legislative purposes regarding the
> treatment of dependent, neglected and abused children.
> Children have certain fundamental rights which must be
> protected and preserved, including but not limited to, the
> rights to adequate food, clothing and shelter; the right to

---

[7] The appeal named the Cabinet as the appellee but only certified service through counsel representing the Cabinet, the Henderson County Attorney's office. Appellee asserts failure to name an indispensable party to the appeal as grounds for dismissal and cites *M.M. v. Allen County Attorney's Office*, 590 S.W.3d 836 (Ky. App. 2019). Appellee is incorrect in its assertion as the Cabinet is clearly named in the notice of appeal and Kentucky Rule of Appellate Procedure ("RAP") (2)(A)(2) makes all parties to the underlying proceeding parties to the appeal. Service of the notice of appeal upon the attorney representing the Cabinet was proper.

[8] Appellee also asserts that Appellants waived their right to appeal by agreeing to the subsequent disposition rather than requesting a continuance to avoid delay. Appellee is incorrect. "Under KRS 610.080, DNA actions are bifurcated proceedings, *i.e.*, they involve two distinct hearings: adjudication and disposition. The adjudication determines the truth or falsity of the allegations in the DNA petition, while the disposition determines the action to be taken by the court on behalf of the child or children." *M.C. v. Cabinet for Health & Fam. Servs.*, 614 S.W.3d 915, 920-21 (Ky. 2021) (footnotes omitted). While only a disposition order is a final and appealable order, the Appellants here properly filed their notice from the adjudication order, as amended, and the disposition order of November 14, 2025. They did not waive their right to appeal by agreeing to the disposition which simply continued restrictions for supervised visitation at the Cabinet's discretion, despite their objections to the prior adjudication.

-15-

be free from physical, sexual or emotional injury or exploitation; the right to develop physically, mentally, and emotionally to their potential; and the right to educational instruction and the right to a secure, stable family. It is further recognized that upon some occasions, in order to protect and preserve the rights and needs of children, it is necessary to remove a child from his or her parents.

"The burden of proof shall be upon the complainant, and a determination of dependency, neglect, and abuse shall be made by a preponderance of the evidence." KRS 620.100(3). The preponderance of the evidence standard is satisfied if it can be proven that the child was "more likely than not" abused or neglected. *Ashley v. Ashley*, 520 S.W.3d 400, 404 (Ky. App. 2017) (quoting *Caudill v. Caudill*, 318 S.W.3d 112, 114 (Ky. App. 2010)). Here, sadly, there is no dispute that, more likely than not, Child was abused. Child was non-mobile at the time of the injuries, and the undisputed evidence was that these were not injuries caused by accidental means. The question is simply who can be held accountable for the abuse and subject to an adjudication that can have lasting ramifications.

Our review of a family court's order in a DNA action is limited to whether the factual findings of the lower court are clearly erroneous. If the findings are supported by substantial evidence, then our appellate review is limited to whether the facts support the legal conclusions made by the finder of fact. The legal conclusions are reviewed *de novo*. *L.D. v. J.H.*, 350 S.W.3d 828, 829-30 (Ky. App. 2011) (citations omitted). Since only the three named members of

Father's household appeal from the order, we focus this Opinion on the sufficiency of the evidence as to those three individuals.

The family court's subsequent order in response to the request for individualized findings stated the following:

3) **[E.D. (Paternal Grandmother)]**

    a) The Court finds that:

        i) [E.D.] participated in the child's care while the child was in Father's home.

        ii) She failed to recognize or protect the child from serious, repeated injury.

        iii) By a preponderance of the evidence, the child was abused or neglected as to [E.D.].

4) **[J.D. (Paternal Grandfather)]**

    a) The Court finds that:

        i) Although [J.D.] had minimal time alone with the child, he was part of the caregiving environment and had responsibility for care and protection.

        ii) He failed to protect the child or provide an adequate explanation for the injuries.

        iii) By a preponderance of the evidence, the child was abused or neglected as to [J.D.].

5) **[A.D. (Paternal Aunt)]**

    a) The Court finds that:

i) [A.D.] provided care and supervision during relevant periods.

ii) She failed to protect the child or provide any credible explanation for significant nonaccidental injury.

iii) By a preponderance of the evidence, the child was abused or neglected as to [A.D.].

Appellants argue that this case presents a fundamental question of whether a trial court may adjudicate individuals for abuse and neglect without identifying individualized findings or establishing that any particular individual even had knowledge of the injuries.

For their response, the Henderson County Attorney's Office argues that our precedent does not require the identification of a specific perpetrator to establish abuse has occurred. *Commonwealth, Cabinet for Health & Fam. Servs. ex rel. M.H. v. R.H.*, 199 S.W.3d 201, 204 (Ky. App. 2006), *as modified* (Aug. 18, 2006). We agree, but our inquiry does not end there. In this case, the fact that the abuse occurred was established.

In *M.H.*, the family court did not name the perpetrator but found that *the parents* had "created or allowed to be created a risk" that the child could be abused. *Id.* This Court held that the identity of the perpetrator was not material to the finding that abuse had occurred, because the statute requires a finding that a

-18-

parent or guardian has created or allowed to be created a risk that the child will be the victim of sexual abuse or exploitation. *Id.*

Here, there is no appeal from the family court's finding that one of these parents had created or allowed to be created a risk that Child could be abused. The family court, or the Cabinet, had already put protections in place as to those parents, created case plans as to each of them, and required supervision for months before the hearing. However, the Cabinet did not file a petition against only these parents as occurred in *M.H.* Instead, the Cabinet chose to file a petition against four others who "had access" to Child, while leaving out others who also had access to Child without any real explanation.

To sustain an adjudication of abuse under KRS 620.100(3), the Cabinet has the burden to prove by a preponderance of evidence that a specific person either "inflicts or allows to be inflicted" physical injury. This burden presupposes knowledge or reason to know of someone causing injury to the child if that person is not the perpetrator. However, the family court did not find that any of these Appellants observed any bruise, was present during any event, or had any knowledge or information that would have triggered a duty to act. None of the Appellants expressed any such knowledge or observation of any injury and there was no evidence refuting their denials.

In fact, after hearing all the evidence, the family court orally stated, "the injuries were caused by someone in this room . . . or someone else." In other words, the family court recognized that the harm could have been caused by someone else not even named in these petitions. That is not a finding sufficient to support the later adjudication that these Appellants abused Child.

The family court shifted the burden outlined above by penalizing these grandparents and an aunt for failing to provide a credible or adequate explanation for Child's injuries. It converted their lack of any explanation for the injuries or lack of knowledge of the injury at all, into evidence of responsibility. When the Cabinet's own investigator and the expert witness could not determine the perpetrator after an investigation, the family court's requirement that the Appellants provide a credible explanation for injuries that they specifically denied witnessing is simply inappropriate burden shifting. *S.H. v. Cabinet for Health & Fam. Servs.*, 717 S.W.3d 749 (Ky. App. 2025). The court's finding that "none of these Appellants could provide an explanation for the injuries" is simply not sufficient to sustain a finding that each of them abused the child.

Further, Appellants are not Child's parent, guardian, or legal custodian. While non-parents can be adjudicated in a DNA proceeding, there are parameters for such actions. We first turn to KRS 600.020(1)(a), which defines an "[a]bused or neglected child" as "a child whose health or welfare is harmed or

threatened with harm" by "her parent, guardian, person in a position of authority or special trust, as defined in KRS 532.045, or other person exercising custodial control or supervision of the child[.]" For DNA proceedings, "[t]he primary or initial objective . . . is to determine if a child is receiving proper parental care, but if the parent is not exercising custodial control and supervision, then that the person exercising custodial control and supervision . . . is providing proper care to the child." *Cabinet for Health & Fam. Servs. v. Baker*, 645 S.W.3d 411, 422 (Ky. 2022) (citing KRS 620.010; KRS 600.020(1)(a); KRS 620.070).

A "[p]erson exercising custodial control or supervision" under KRS 600.020(47) is defined as "a person or agency that has assumed the role and responsibility of a parent or guardian for the child, but that does not necessarily have legal custody of the child." Here, the court specifically stated that each of the Appellants qualified as a PECCS.

Both parties refer us to *Department for Community Based Services, Cabinet for Health and Family Services v. Baker*, 613 S.W.3d 1 (Ky. 2020), as supporting their positions. In *Baker*, our Supreme Court was reviewing administrative proceedings addressed to the Cabinet's ability to investigate a non-family member for abuse or neglect. Ms. Baker was a worker at an elementary school's afterschool program. *Id.* at 2. There was a report of inappropriate touching involving two minor children at the afterschool program while Ms. Baker

was a supervisor. *Id.* at 11. However, the Court found there was insufficient evidence that Ms. Baker failed to provide adequate supervision and that the evidence was undisputed she was not even aware the alleged touching was occurring. *Id.* at 12. Our Supreme Court reversed the substantiation of neglect against Ms. Baker.

However, in addressing the appeal, the Court also stated that "Ms. Baker was not a 'person exercising custodial control or supervision' over the children in the afterschool program. By all accounts, Ms. Baker was essentially a babysitter and had no custodial control or supervision over the children in the afterschool program." *Id.* at 4 (quotation marks added). We find the status of the individual in *Baker* similar to that of Appellants who were only babysitters on limited occasions. SSC Miller testified to a broad definition of caretakers for DCBS purposes, which may align with the Cabinet's statutory *duty to investigate* allegations of abuse, neglect, or dependency. *See id.* at 6 (citing KRS 620.050(4)). However, the duty to investigate does not open the door to hold any person who has ever resided with or babysat a child to become a target for DNA proceedings. The evidence presented at the hearing did not support a finding that Appellants "assumed the role and responsibility of a parent or guardian[.]" KRS 600.020(47).

There is very little reported case law further addressing who might qualify as a PECCS under this statute, but we doubt that either Paternal Aunt or

Paternal Grandfather would qualify. More concerning, though, here we have only a finding that these three "babysitters" had "access to the child" at some point during the two-month period when the injuries were believed to have occurred. Without more, the determination by the family court that these three "committed or allowed abuse as defined by the statute" is simply not supported by substantial evidence. As the family court orally noted, the abuse could have been perpetrated by someone not even in the case. The petition named six adults as persons responsible, but did not identify any specific injury, in any specific household, or during any specific custodial period, with the sole exception of the jawline bruise substantiated against Mother.

Furthermore, the evidence was non-existent that any of the Appellants committed any act of abuse on Child. Paternal Grandmother babysat Child for Father when he was working or sleeping and also testified that she had never observed any injuries or reason to believe that Child was injured during those times. The evidence was non-existent that the Appellants had any knowledge of or reason to know of the fractured ribs of Child. Dr. Currie stated that these are injuries which are not commonly recognized by non-offending caregivers. The family court's "finding" recites some of the statutory language in KRS 600.020(1)(a), but the findings were unsubstantiated by any evidence whatsoever.

At best, there was a "risk" that one or more of these non-parents were aware of the confirmed abuse. To establish abuse or neglect through risk of harm, the risk of harm must be more than a mere theoretical possibility; it must be an actual and reasonable potential for harm. *M.C.*, 614 S.W.3d at 921-22. A risk of harm cannot be established through inferences upon inferences, as that is nothing but speculation. *C.L. v. Cabinet for Health & Fam. Servs.*, 653 S.W.3d 599, 609 (Ky. App. 2022) (citation omitted).

The family court sought to protect Child from further harm, which is commendable, and it clearly struggled with the lack of any substantiation of harm by the Cabinet against any party other than Mother. However, the family court had authority to impose restrictions upon Mother and Father that could have protected Child from further harm. In fact, the already imposed restrictions upon the parents did include protections as to persons authorized to perform babysitting or supervision requirements. The record did not contain substantial evidence on which to base its finding of abuse by these Appellants.

## CONCLUSION

Therefore, we REVERSE those findings and REMAND with directions to dismiss the petitions as to the Appellants.


ALL CONCUR.


-24-

BRIEFS FOR APPELLANTS:        BRIEF FOR APPELLEE:

Jason A. Bowman            Misty M. Stone
Louisville, Kentucky        Assistant County Attorney
                            Henderson, Kentucky